**Law Offices of Carlos R. Barrios & Assoc. a P.C.**
Carlos R. Barrios 249654
510 West 6th Street Suite 1210
Los Angeles, CA 90014
Tel.: (213) 599-8414
Fax.: (888) 255-9710

Attorneys for Petitioner,
RAMON FLORES ARROYO

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RAMON FLORES ARROYO,<br><br>Petitioner,<br><br>VS.<br><br>MARKWAYNE MULLIN, Secretary, United States Department of Homeland Security; RODENY S. SCOTT, Commissioner, United States Customs and Border Protection; JAIME RIOS in his official capacity as Acting Field Office Director for Los Angeles, U.S. Immigration and Customs Enforcement; EDDY WANG, Special Agent in Charge for Los Angeles, Homeland Security Investigations, U.S. Immigration and Customs Enforcement; WARDEN OF ADELANTO ICE PROCESSING CENTER, in his/her capacity as warden of the ADELANTO ICE PROCESSING CENTER, and DOES 1 to 10, INCLUSIVE.<br><br>Respondents. | Case No.<br><br>Related Case: Flores Arroyo v. Mullin, No. 5:26-cv-04263-KES<br><br>**RENEWED VERIFIED PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241; REQUEST FOR IMMEDIATE RELEASE** |

## INTRODUCTION

1. Petitioner Ramon Flores Arroyo respectfully brings this renewed Petition for Writ of Habeas Corpus to challenge a new and continuing deprivation of physical liberty that arose only after he prevailed in his original federal habeas proceeding. On August 12, 2026, this Court granted Petitioner's prior Petition for Writ of Habeas Corpus and ordered Respondents to provide an individualized bond hearing pursuant to 8 U.S.C. § 1226(a) within seven days. *Flores Arroyo v. Mullin*, No. 5:26-cv-04263-KES, 2026 WL 2337883, at *1 (C.D. Cal. Aug. 12, 2026).
2. Rather than ordering Petitioner's immediate release at that time, the Court afforded Respondents the lesser remedy of an individualized administrative proceeding through which the Government would have an opportunity to establish a lawful basis for continuing to deprive Petitioner of his liberty.
3. The August 12 judgment therefore did not finally resolve whether Petitioner could constitutionally remain incarcerated after such a hearing; the operative custody determination challenged here did not yet exist. The published order confirms that the prior Court granted the petition and ordered the § 1226(a) hearing within seven days.
4. Respondents received that opportunity. On August 18, 2026, Immigration Judge Darin Flagg conducted the court-ordered custody redetermination and

denied release solely on the ground that Petitioner had not established that he was not a flight risk. The Immigration Judge made no finding that Petitioner poses a danger to the community.

5. Indeed, Petitioner has never suffered a criminal conviction, and DHS's own enforcement records report negative criminal-record checks for outstanding wants, warrants, and lookouts. The new constitutional question is therefore narrow but fundamental: whether the written reasons supplied on August 18 lawfully establish that this fifty-six-year-old man, who has lived in the United States since approximately 1989, owns a home, maintained decades of employment, has three United States citizen children and several United States citizen grandchildren, and has no criminal convictions, must remain physically incarcerated because no reasonable condition can adequately assure his future compliance.

6. The August 18 written order supplies the answer. This is not a case in which Petitioner merely disagrees with the weight an Immigration Judge assigned competing equities. The order reveals identifiable errors in the application of the governing legal standards. The Immigration Judge treated Petitioner's unauthorized entry and decades of unauthorized employment as evidence of a generalized "inability or unwillingness to follow the laws of the United States"; treated the uncertain outcome of a pending Motion to Reopen and

prospective cancellation application as an affirmative "flight risk factor"; inferred from two historical tax-identification numbers, without independent documentary verification, that Petitioner apparently used a false Social Security number; characterized Petitioner's brother as an "unreliable sponsor" because the brother had not produced financial documentation; and concluded that Petitioner's brief attempt to evade arrest demonstrated that he was unlikely to cooperate with **any** alternative to detention. The order then rejected monetary bond and all nonmonetary alternatives while expressly acknowledging that the Court lacked sufficient financial information to determine what bond Petitioner could actually afford. See Aug. 18, 2026 Custody Order at 1–2 ("Custody Order"), attached as Exhibit B.

7. The treatment of monetary bond and alternatives to detention is particularly significant. Judge Flagg stated that although he had considered alternatives to detention and monetary bond, he believed "no such alternatives or monetary bond is appropriate" and simultaneously stated that the Court did not possess "sufficient information from which to assign any type of bond." Custody Order at 1. When counsel later proposed a "large bond," the Immigration Judge explained that Petitioner's brother had not submitted proof of his finances, that although Petitioner owned a home the Court lacked precise information concerning its value or equity, and that although

Petitioner earned approximately $57,000 in 2025, his current finances were uncertain because detention caused him to lose his employment. On that basis, the Court concluded that it remained "unclear what amount the Respondent could pay." Id. at 2. Those statements do not establish that no condition can manage flight risk. They establish uncertainty concerning the precise amount of an affordable monetary condition.

8. That distinction is constitutionally consequential. *Hernandez v. Sessions*, 872 F.3d 976, 990–94, 1000 (9th Cir. 2017), requires meaningful consideration of financial circumstances and alternative release conditions because civil detention cannot become a consequence of poverty rather than a measure reasonably related to flight risk or danger. Ability-to-pay analysis is therefore a protection against unnecessary detention; it is not an evidentiary obstacle that permits incarceration whenever the detainee has failed to establish, with financial-accounting precision, exactly how much money he, his family, or the equity in his home could produce.

9. Section 1226(a)(2) likewise expressly contemplates more than one release mechanism: monetary bond of at least $1,500 or conditional parole. Thus, even assuming the evidence was insufficient to calculate the highest monetary bond Petitioner's household could afford, that uncertainty did not answer whether a lower bond, conditional parole, GPS monitoring,

scheduled reporting, geographic restrictions, electronic supervision, or some combination of those measures could reasonably assure future compliance. The Ninth Circuit has recognized that failure to meaningfully consider ability to pay and alternatives can result in detention disconnected from the Government's legitimate regulatory objective.

10. Nor does Petitioner ask this Court to disregard the strongest adverse circumstance identified by the Immigration Judge. DHS alleges that when ICE officers initiated a vehicle stop on July 7, 2026, Petitioner pulled over his truck, exited, and ran approximately one-half block before falling and being apprehended. That conduct is relevant to prospective flight risk and may properly be considered under *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006). The issue, however, is not whether some evidence weighs against Petitioner. Section 1226(a) does not authorize civil imprisonment whenever any risk exists. Its express authorization of bond and conditional parole necessarily presupposes that risks short of an unmanageable risk can be addressed through conditions. The question therefore is whether the whole record rationally establishes that Petitioner's risk cannot reasonably be managed outside physical incarceration.

11. The written order does not supply that bridge. The Immigration Judge inferred from one brief arrest-day incident that Petitioner would be unlikely

to cooperate with "any alternatives to detention," even though the order identifies no history of violating electronic monitoring, failing to report under a formal ICE supervision program, jumping bond, disobeying an immigration-court appearance order, or violating conditions of release. It similarly converted uncertainty regarding the eventual success of immigration relief into affirmative evidence against appearance, while giving little meaningful analytical treatment to Petitioner's extraordinary length of United States residence, home ownership, decades of work, extensive family ties, complete absence of criminal convictions, and powerful present incentive to participate in the pending proceedings through which he seeks lawful relief.

12. This procedural posture is also critical to the remedy. Petitioner has already prevailed once in habeas. This Court already afforded Respondents an opportunity to cure the original constitutional deficiency through an individualized custody proceeding. Respondents received that opportunity and obtained a written administrative determination. If that completed determination rests upon an incorrect legal standard or an unreasonable application of the governing flight-risk framework, habeas does not require a third attempt while Petitioner remains incarcerated.

13. In *Fletes-Velasquez v. Hernandez*, No. C26-1908-TSZ (W.D. Wash. June 30, 2026), the petitioner similarly prevailed in an initial habeas action, received a court-ordered bond hearing, was again denied release solely on flight-risk grounds, and filed a new habeas petition. The district court excused BIA exhaustion, reviewed the new determination under *Martinez*, concluded that the IJ abused his discretion, and ordered release within twenty-four hours rather than another bond hearing.

14. Petitioner therefore asks this Court to exercise the core authority conferred by 28 U.S.C. § 2241: determine whether the Executive presently possesses a lawful basis for continuing physical custody. Because the August 18 determination does not supply a legally sufficient individualized justification for continued incarceration, and because Respondents have already received the lesser remedial opportunity previously afforded by this Court, Petitioner respectfully requests issuance of the writ and immediate release under reasonable noncustodial conditions.

**JURISDICTION AND VENUE**

15. This Court possesses jurisdiction under Article I, Section 9, Clause 2 of the United States Constitution, 28 U.S.C. §§ 1331 and 2241, and the Due Process Clause of the Fifth Amendment because Petitioner remains physically confined by DHS and ICE within the Central District of

California and alleges that the custody presently restraining his liberty violates the Constitution and laws of the United States. The "essence of habeas corpus" is an attack upon the legality of present physical custody, *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973), and federal courts retain jurisdiction over constitutional and legal challenges to immigration detention notwithstanding statutory limitations upon review of discretionary immigration decisions. See *Singh v. Holder*, 638 F.3d 1196, 1200–03 (9th Cir. 2011); *Martinez v. Clark*, 124 F.4th 775, 779–85 (9th Cir. 2024).

16. This renewed Petition does not seek review of any final removal order, request adjudication of Petitioner's pending Motion to Reopen, or ask this Court to decide whether Petitioner ultimately qualifies for cancellation of removal. Those questions remain before the appropriate immigration and appellate tribunals. Petitioner instead challenges the separate and continuing exercise of executive detention authority—the physical incarceration that persists today because of the August 18 custody ruling. The distinction between removal and detention is essential: the Government's authority to continue litigating whether Petitioner may remain in the United States does not automatically establish a corresponding authority to imprison him while that litigation proceeds.

17. Section 1226(e) does not bar this Court's review. Petitioner recognizes that a federal habeas court may not simply substitute its own discretionary evaluation of the *Guerra* factors for that of the Immigration Judge. After the Supreme Court's decision in *Wilkinson v. Garland*, 601 U.S. 209 (2024), however, the Ninth Circuit held that application of an immigration-detention standard to established facts presents a mixed question of law and fact reviewable for abuse of discretion. *Martinez*, 124 F.4th at 779–85. Under that standard, a reviewing court "cannot reweigh evidence" but may determine whether the agency "applied the correct legal standard." *Id.* at 785. The Ninth Circuit thus expressly recognizes federal jurisdiction to review whether an administrative custody determination rests upon correct legal premises and a legally permissible application of those premises.

18. That is precisely the challenge presented here. Petitioner does not ask this Court to decide whether his home ownership deserves five units of weight while the July 7 incident deserves three. He challenges, among other things, whether *Hernandez* permits detention because the IJ lacks precise evidence from which to calculate affordability; whether speculative relief may be converted from an absence of mitigating weight into affirmative evidence of flight; whether unverified assumptions about an old identifying number may be treated as established deception; whether failure to establish a sponsor's

liquidity proves the sponsor is unreliable for flight-risk purposes; and whether one attempt to avoid arrest rationally establishes that **no** alternative condition can work. Those are questions about application of legal standards, not invitations to conduct de novo bond review.

19. This Petition also does not constitute a duplicative or improper attempt to relitigate the claim adjudicated in Case No. 5:26-cv-04263-KES. The prior action challenged detention before Petitioner received an individualized § 1226(a) custody hearing. The Court granted relief on August 12, 2026, and ordered that hearing. The custody decision challenged here was not entered until August 18, 2026. The operative facts, administrative record, and claimed constitutional injury therefore arose after judgment in the first case and could not have been adjudicated there.

20. Venue is proper under 28 U.S.C. § 2241 because Petitioner remains confined at the Adelanto ICE Processing Center within the territorial jurisdiction of this Court and his immediate custodian is located within this District. Venue is independently proper under 28 U.S.C. § 1391(e) because the federal officials responsible for Petitioner's custody act in their official capacities and a substantial portion of the events giving rise to the renewed detention claim occurred within this District.

## PARTIES

21. Petitioner RAMON FLORES ARROYO is a fifty-six-year-old native and citizen of Mexico presently confined at the Adelanto ICE Processing Center. Petitioner has resided in the United States since approximately June 1989 and has spent nearly four decades building his home, employment history, family relationships, and community life in Southern California. Prior to detention, Petitioner resided at a fixed address in Port Hueneme, California, worked as a landscaper, owned residential property, and supported members of his family. He is the father of three United States citizen children and grandfather of several United States citizen grandchildren.

22. Respondent Markwayne Mullin is the Secretary of the United States Department of Homeland Security (DHS). As Secretary Respondent MULLIN exercises ultimate authority over DHS and its component agencies, including U.S. Customs and Border Protection ("CBP") and U.S. Immigration and Customs Enforcement ("ICE"), and is responsible for the administration and enforcement of the Immigration and Nationality Act ("INA"). He is sued in his official capacity.

23. Respondent RODNEY S. SCOTT is the Commissioner of U.S. Customs and Border Protection ("CBP"), a component agency of DHS. In this capacity, Respondent SCOTT is responsible for the policies, practices, and

operations of CBP, including the apprehension and initial processing of individuals alleged to be inadmissible under the INA. He is sued in his official capacity.

24. Respondent JAIME RIOS is the Acting Field Office Director for the Los Angeles Field Office of U.S. Immigration and Customs Enforcement ("ICE"), a component agency of DHS. In this role, Respondent RIOS exercises direct supervisory authority over ICE Enforcement and Removal Operations ("ERO") officers responsible for the detention, transfer, and release of individuals within this District, including those held at the DESERT VIEW FACILITY. He is the immediate custodian of Petitioner and is sued in his official capacity.

25. Respondent EDDY WANG is the Special Agent in Charge for the Los Angeles office of Homeland Security Investigations ("HSI"), a component division of ICE within DHS. This office also covers the San Bernardino region. In this capacity, Respondent Wang oversees investigations and enforcement operations in the Los Angeles area that lead to the apprehension and referral of individuals to ERO for detention. He is sued in his official capacity.

26. WARDEN OF THE DESERT VIEW FACILITY, as warden of the DESERT VIEW FACILITY, the Warden oversees the detention center in which petitioner is housed. The warden is sued in his/her official capacity

27. Respondents DOES 1 through 10 are additional officers, agents, or employees of the United States whose identities are currently unknown, and who are responsible in whole or in part for the unlawful acts alleged herein. Petitioner will amend this Petition to allege their true names and capacities when they are ascertained.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Petitioner's Nearly Four Decades of Residence, Employment, Family Ties, and Absence of Criminal Convictions

28. Petitioner entered the United States in approximately June 1989, when he was nineteen years old, and has remained in this country throughout virtually his entire adult life. DHS's own Form I-213 records his entry as occurring on or about June 20, 1989, and identifies his Port Hueneme residence and occupation. Over the ensuing decades Petitioner maintained employment, established a household, purchased property, raised children, and became deeply embedded in the Southern California community. Prior to his July 2026 arrest, he was not transient or living anonymously; he resided at a known fixed address and worked openly as a landscaper.

29. Petitioner's ties are particularly substantial because his immediate family is established in the United States. He is the father of three United States citizen children and the grandfather of several United States citizen grandchildren. His daughter who is relevant to his pending cancellation claim is nineteen years old and has been diagnosed with bipolar disorder. The August 18 Immigration Judge expressly acknowledged that she does well when properly medicated, that her medications had been paid through Petitioner's insurance, and that Petitioner lost that insurance as a consequence of being detained. Custody Order at 1. Petitioner's detention therefore affects not only his own physical liberty but the family support structure upon which his United States citizen daughter depends.

30. Petitioner has never suffered a criminal conviction. DHS's own July 7, 2026 immigration record states that checks for outstanding wants, warrants, and lookouts were negative.

31. The Immigration Judge made no finding of dangerousness at the August 18 hearing, and the written custody ruling identifies flight risk as the sole basis for continued incarceration. This is therefore not a case in which physical detention is independently justified by protection of the community from criminal conduct; the entire constitutional justification rises or falls with the asserted need to ensure Petitioner's future appearance and compliance.

### B. Petitioner's Immigration Proceedings Have Long Been Complicated by Ineffective Assistance and Lack of Notice

32. Petitioner's immigration proceedings began more than two decades ago after he filed an asylum application in August 2001 and was placed into removal proceedings. In June 2002, the Immigration Judge granted Petitioner voluntary departure.

33. Petitioner pursued administrative review, and after the BIA denied a motion to reopen, he sought review before the Ninth Circuit. In March 2006, the Ninth Circuit remanded the matter to the Board for reconsideration of Petitioner's claim that ineffective assistance of prior counsel had deprived him of the benefit of voluntary departure.

34. On remand, the BIA reopened Petitioner's proceedings in September 2006 for the limited purpose of restoring a thirty-day period of voluntary departure. Petitioner's current Motion to Reopen alleges, however, that he never received actual notice of that ruling because it was transmitted through the same representation whose deficiencies had already produced the Ninth Circuit remand. Petitioner contends that he remained unaware that the Board had reopened his proceedings and restored voluntary departure until ICE arrested him twenty years later. The merits of that lack-of-notice claim are not before this Court, but they matter to the custody analysis because the Immigration Judge treated Petitioner's failure to depart in 2006 as part of an

adverse compliance history while the legal explanation for that failure remains the subject of active administrative litigation.

35. After learning of the 2006 disposition, Petitioner did not disappear or attempt to avoid the adjudicative process. He promptly retained counsel, pursued reopening before the BIA, sought federal judicial relief, and invoked the Ninth Circuit's jurisdiction.

36. On July 8, 2026, Petitioner filed a Petition for Review and Motion to Stay Removal in *Flores Arroyo v. Blanche*, No. 26-4349. The Ninth Circuit docket reflects that General Order 6.4 placed a temporary stay of removal into effect on July 9, 2026. Thus, at least from the public appellate record presently available, Petitioner's removal has not been an immediately executable event while that judicial proceeding remains pending.

37. These pending proceedings bear directly upon prospective appearance. Petitioner seeks reopening because he wishes to litigate cancellation of removal based in substantial part upon the hardship to his United States citizen daughter. Success requires his continued participation with counsel, the BIA, the Immigration Court if reopening is granted, and the Ninth Circuit. Absconding would jeopardize the very remedies he has retained lawyers and invoked multiple adjudicative forums to obtain. Although the existence of pending relief does not itself establish absence of flight risk,

Petitioner's active pursuit of concrete proceedings supplies a rational incentive to remain available rather than disappear.

### C. The July 7, 2026 Enforcement Encounter

38. On July 7, 2026, ICE conducted a targeted enforcement operation at Petitioner's Port Hueneme residence. According to DHS's I-213, agents observed Petitioner loading items into his truck, positively identified him using a database photograph, followed him after he drove away, and eventually initiated a vehicle stop. DHS alleges that Petitioner stopped, exited the vehicle, and ran while officers identified themselves as police and ordered him to stop. Petitioner states that he ran approximately one-half block before falling, after which the officers apprehended him.

39. Petitioner acknowledges that this event is relevant evidence under *Matter of Guerra*, which permits consideration of attempts to flee prosecution or otherwise escape authorities. The custody question, however, is prospective and contextual. The fact that Petitioner reacted by running during an unanticipated enforcement operation is not identical to evidence that he has violated bond, failed to report under an order of supervision, absconded from electronic monitoring, missed scheduled Immigration Court hearings after receiving notice, or disregarded formally imposed release conditions. The Immigration Judge was entitled to give the event substantial weight, but the

legal inquiry still required consideration of whether reasonable, enforceable conditions could manage the risk it demonstrated.

**D. Petitioner Prevailed in His First Habeas Action**

40. After his arrest, Petitioner sought custody relief but was initially denied an individualized bond determination. He therefore filed *Flores Arroyo v. Mullin*, No. 5:26-cv-04263-KES, under 28 U.S.C. § 2241. On August 12, 2026, Magistrate Judge Karen E. Scott granted the Petition and ordered a bond hearing pursuant to § 1226(a) within seven days. Judgment was entered that same day. The first habeas case therefore afforded Respondents an opportunity to justify continued detention through an individualized custody process instead of directing Petitioner's immediate release. The district court's August 12 order and judgment should be attached as Exhibit A. The public docket confirms both the August 12 release order and judgment.

**E. The August 18 Court-Ordered Bond Hearing and Written Denial**

41. On August 18, 2026, Immigration Judge Darin Flagg conducted the custody redetermination required by the federal judgment. The Immigration Judge concluded that the prior District Court order had not shifted the burden of proof and therefore placed upon Petitioner the burden of demonstrating that he was not a danger or flight risk. Petitioner does not premise this renewed

Petition upon the proposition that this formal burden allocation, standing alone, violated the August 12 judgment. Rather, even assuming the burden properly remained with Petitioner, the written reasons demonstrate that the burden was applied in a manner that demanded proof far exceeding a reasonable preponderance showing that risk could be managed through appropriate conditions.

42. The Immigration Judge first concluded that Petitioner's unlawful entry in 1989 and decades of unauthorized work demonstrated an "inability or unwillingness to follow the laws of the United States," which the Court treated as a flight-risk factor. Custody Order at 1. The Immigration Judge then considered Petitioner's pending Motion to Reopen and proposed 42B application, recognized that such relief was "potentially cognizable," but concluded that because Petitioner must first obtain reopening and thereafter prevail on cancellation, the relief was "on the more speculative side." The Court expressly stated: "This is a flight risk factor." Id.

43. The Immigration Judge next considered historical tax records. According to the order, Petitioner's 1999 and 2000 tax filings reflected a number ending in 1364, whereas later filings reflected a number ending in 7154 that Petitioner understood to be his ITIN. Petitioner was uncertain about the earlier number. Without evidence from the Social Security Administration, IRS verification,

evidence identifying the owner of the earlier number, or a separate finding establishing knowing misuse, the Immigration Judge reasoned that because multiple ITINs appeared unlikely, the earlier number "appears to be use of a false social security number." Id. at 2.

44. The Court then used that inference in two separate ways: as evidence of Petitioner's supposed unwillingness to follow law and as a predicted negative discretionary consideration in any future cancellation proceeding.

45. The Immigration Judge gave substantial weight to Petitioner's brief attempt to evade officers during the July 7 enforcement encounter and described that incident as "a serious flight risk." Id.

46. The Court then made the materially broader inference that the event showed Petitioner was "unlikely to be cooperative with any removal order" and "unlikely to be cooperative with any alternatives to detention." Id. The order does not identify any prior formal alternative-to-detention program Petitioner violated, any history of electronic-monitoring noncompliance, any missed ICE reporting obligation, or any violation of conditions imposed upon a prior release.

47. Finally, counsel expressly proposed a "large bond" as a mechanism to mitigate any legitimate flight concerns. Rather than selecting an amount or fashioning combined conditions, the Immigration Judge concluded both that

bond was inappropriate and that he lacked adequate financial information to determine any monetary amount.

48. The Court cited *Hernandez* for the need to consider ability to pay but reasoned that Petitioner's brother had not produced financial records, that the record did not establish the precise value or available equity in Petitioner's home, and that Petitioner's current finances had become uncertain because detention caused him to lose his employment. The Court acknowledged that Petitioner earned approximately $57,000 in 2025 and owned a home, but concluded that because it was unclear what amount Petitioner could pay, no bond would be set. Custody Order at 2.

49. The Immigration Judge denied release. Petitioner reserved his right to appeal, and the written order lists September 17, 2026 as the administrative appeal deadline. The order therefore provides a complete statement of the reasons presently supporting Petitioner's physical incarceration, and those reasons form the basis of this renewed habeas action.

**FURTHER ADMINISTRATIVE EXHAUSTION IS PRUDENTIAL AND SHOULD BE EXCUSED**

50. The anticipated exhaustion defense warrants careful analysis because this case does not arise from an ordinary first-instance bond disagreement. Administrative exhaustion in § 2241 immigration-detention cases is prudential rather than jurisdictional. *Hernandez*, 872 F.3d at 988; *Puga v.*

*Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007). *Puga* asks whether agency expertise is necessary to develop a proper record and reach a proper decision, whether excusing exhaustion would encourage deliberate circumvention of the administrative scheme, and whether administrative review is likely to permit agency self-correction and eliminate the need for judicial intervention.

51. Those considerations are functional rather than ritualistic. Applied to the completed, post-judgment custody determination before this Court, all three weigh against requiring Petitioner to remain incarcerated while pursuing another administrative cycle.

**A. The First *Puga* Factor Weighs Strongly Against Exhaustion Because the Record Is Complete and the Issues Are Legal**

52. The first *Puga* factor asks whether agency expertise is necessary to generate a proper record and reach a proper decision. That question must be evaluated according to the actual federal claim rather than the BIA's general expertise in immigration matters.

53. Petitioner is not asking this Court to decide whether he deserves cancellation, whether his Motion to Reopen should be granted, or what discretionary weight the Board should place upon an immigration equity. He asks whether a completed custody proceeding used legally permissible standards to determine that his physical incarceration must continue. The

relevant evidence has already been submitted, the hearing has already occurred, and the Immigration Judge has already issued a written explanation.

54. This posture differs materially from *Puga* itself. There, administrative exhaustion served a genuine record-development and agency-correction function because the petitioner presented an ineffective-assistance claim arising within immigration proceedings that the BIA could initially investigate and adjudicate. 488 F.3d at 815–16.

55. Here there is nothing comparable left to develop concerning the constitutional event challenged. The August 18 order identifies the burden used, the facts considered, the legal authorities invoked, the inferences drawn, and the reasons release was denied. A later BIA ruling can affirm, reverse, or provide additional analysis, but it cannot alter what standard Judge Flagg actually applied on August 18 or restore the liberty lost under that decision in the meantime.

56. The first factor is particularly compelling because *Martinez* identifies precisely this type of question as appropriate for federal review. A habeas court reviewing a mixed custody determination for abuse of discretion does not rehear testimony or independently rebalance equities; it determines whether the agency applied the correct legal standard. *Martinez*, 124 F.4th at

784–85. The principal issues here—what *Hernandez* permits when precise affordability information is incomplete, what *A-L-S-* says about speculative relief, what evidentiary predicate supports treating suspected Social Security misuse as established misconduct, and whether the stated reasons rationally establish that no alternative condition can work—are questions a federal court may decide on the existing written record.

57. Courts within the Ninth Circuit have applied *Puga* in precisely this fashion. In *Suchite-Mendez v. Mullin*, No. 2:26-cv-01691-DGE (W.D. Wash. June 23, 2026), the court acknowledged the BIA's general bond expertise but held that the first factor weighed against exhaustion because the petitioner challenged the constitutional adequacy of the hearing and whether the IJ abused discretion in finding flight risk—issues "better suited to review by the federal courts" where the relevant facts were already established. The court therefore concluded that BIA expertise was unnecessary to generate a proper record or decision on the federal claim.

### B. The Second *Puga* Factor Weighs Against Exhaustion Because Petitioner Has Not Bypassed the Administrative Scheme

58. The second factor—deliberate bypass—is even less applicable. Petitioner did not decline available custody procedures in favor of a preferred federal forum. He first attempted to obtain custody review, then prevailed in federal habeas when constitutionally adequate individualized review was

unavailable, and thereafter returned to Immigration Court because this Court ordered that a § 1226(a) hearing be provided. He appeared before Judge Flagg, submitted to the proceeding, presented evidence, responded to DHS's case, and received a written ruling. The new constitutional injury exists because Petitioner used the remedial administrative proceeding the federal court required.

59. Federal review in those circumstances does not establish a rule allowing every disappointed bond applicant to circumvent BIA review. The circumstance distinguishing this case is the prior habeas judgment. Where an administrative hearing is conducted as the remedy ordered by an Article III court or federal magistrate judge exercising consent jurisdiction, a subsequent claim that the remedial hearing itself failed governing constitutional or legal standards raises an independent question concerning the effectiveness of federal habeas relief.

60. The Board may decide whether it would affirm the IJ under administrative law; it does not supplant the federal court's responsibility to determine whether custody continues in violation of federal law.

61. *Fletes-Velasquez* is directly persuasive. The petitioner there had already prevailed in an earlier habeas case and received a court-ordered bond hearing. When the IJ again denied bond for flight risk, the petitioner did **not**

appeal that new denial to the BIA before filing another § 2241 petition. The district court nevertheless held that exhaustion was unnecessary, explaining that prudential exhaustion is excused where a petitioner alleges that the bond hearing did not comply with the court's prior order. The court relied upon *Zhenwei Lu v. Divver*, No. 26-cv-781, 2026 WL 1755174, at *3–4 (S.D. Cal. June 2, 2026), and related cases reaching the same conclusion.

### C. The Third *Puga* Factor Does Not Require Exhaustion Because BIA Review Cannot Provide Complete or Timely Relief From the Injury Presented

62. Petitioner does not overstate the third factor. The BIA undoubtedly possesses authority to review many errors in ordinary § 1226(a) bond decisions, and it is theoretically possible that the Board could reverse Judge Flagg. But *Puga* asks whether administrative self-correction is likely to obviate the need for federal review of the claim actually asserted, not whether an appellate mechanism exists in the abstract. Here the claim concerns continuing detention after a proceeding supplied through a previous federal habeas judgment, and many of the asserted defects are legal applications apparent from the face of the written order.

63. More fundamentally, BIA review cannot provide complete retrospective relief from the injury Petitioner suffers each day. The injury is not merely

possession of an unfavorable piece of administrative paper; it is physical incarceration.

64. A favorable BIA ruling weeks or months later might terminate future detention, but it cannot restore a single day already spent confined under an allegedly deficient custody determination. That distinction is particularly important where Respondents have already received the benefit of the first federal habeas remedy and have already been afforded an opportunity to provide a lawful individualized justification.

65. Nor is Petitioner's irreparable injury generic. The Immigration Judge himself acknowledged that Petitioner's nineteen-year-old daughter suffers from bipolar disorder, does well when medicated, and had relied upon insurance associated with Petitioner that was lost after detention. Petitioner's incarceration separates him from his United States citizen family, has eliminated employment and insurance upon which members of that family depended, and impairs his ability to assist counsel in litigating the pending Motion to Reopen and Petition for Review.

66. These are individualized consequences of continued detention, not merely a preference for faster adjudication.

**D. Waiver Is Independently Warranted Under *Laing***

67. Even if one or more *Puga* considerations could arguably favor additional administrative review, waiver remains appropriate under *Laing v. Ashcroft*, 370 F.3d 994, 1000–01 (9th Cir. 2004). *Laing* recognizes that prudential exhaustion may be excused where administrative remedies are inadequate or inefficacious, pursuit would be futile, irreparable injury would occur, or the administrative proceeding cannot meaningfully resolve the issue presented. Petitioner's continuing confinement, the individualized family consequences recognized by the Immigration Judge, the existence of a complete written custody record, and the uniquely post-judgment posture of the present claim collectively make continued exhaustion inadequate to protect Petitioner's liberty.

68. The Court should therefore reach the merits. This conclusion does not render BIA custody review meaningless; it simply recognizes that prudential exhaustion exists to serve institutional purposes rather than to require continued incarceration as an end in itself. Where the administrative proceeding has occurred, the record is closed, the federal legal questions are ripe, the petitioner has already participated fully in the remedial process, and another layer of review cannot restore liberty already lost, *Puga* and *Laing* do not require postponement of habeas review.

**THE AUGUST 18 FLIGHT-RISK DETERMINATION IS REVIEWABLE UNDER *MARTINEZ***

69. Section 1226(e) preserves broad administrative discretion but does not immunize legal error. In *Martinez*, the Ninth Circuit held after *Wilkinson* that applying the governing detention standard to an established set of facts presents a reviewable mixed question of law and fact. 124 F.4th at 779–85. Review is deferential: the Court may not substitute its preferred weighing of evidence. But deferential review is not nonexistent review.

70. The Court may determine whether the Immigration Judge employed the correct legal rules and whether the resulting decision constitutes an abuse of discretion under those rules.

71. Petitioner therefore accepts several limitations that sharpen, rather than weaken, this Petition. *Matter of Guerra* gives Immigration Judges broad discretion to consider any probative and specific evidence and permits them to give one factor more weight than another so long as the decision remains reasonable. *Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022), also makes a facial challenge to placing the initial § 1226(a) burden upon the detainee difficult.

72. Petitioner accordingly does not ask this Court to declare every adverse factor irrelevant or to hold that the mere formal placement of the burden upon him invalidated the August 18 hearing.

73. Instead, the claim is that the burden actually applied became materially more demanding than the governing standard and that several components of the IJ's analysis rested upon legally defective premises. A detainee carrying a preponderance burden must persuade the decision-maker that he is likely to appear and does not present an unmanageable flight risk. He is not required to eliminate all uncertainty about the outcome of his immigration litigation, prove every historical identifying number beyond doubt, document to the dollar the liquidity of every relative willing to help, or establish that every conceivable future circumstance will unfold favorably.

74. The written order's repeated treatment of uncertainty itself as adverse evidence effectively pushed Petitioner toward that impermissibly demanding standard.

## THE AUGUST 18 ORDER DOES NOT LAWFULLY ESTABLISH THAT CONTINUED PHYSICAL INCARCERATION IS NECESSARY

### A. The Immigration Judge Inverted *Hernandez* by Turning Incomplete Affordability Evidence Into a Reason for Continued Detention

75. The most substantial defect arises from the order's treatment of bond amount and alternatives. The Immigration Judge invoked *Hernandez* correctly for the proposition that ability to pay matters, but the reasoning thereafter inverted the constitutional purpose of that rule. *Hernandez*

addressed the serious risk that detention will become attributable to poverty rather than flight risk when the decisionmaker does not meaningfully consider financial circumstances and less restrictive alternatives. 872 F.3d at 990–94, 1000.

76. The affordability inquiry therefore prevents unnecessary confinement; it does not create a prerequisite that the detainee must prove exactly how much every member of his family can contribute before release may even be considered.

77. The August 18 order expressly recognized multiple pieces of financial evidence: Petitioner owned a home; he had earned approximately $57,000 the previous year; and his brother offered to fund a substantial bond. The Court regarded that information as incomplete because it lacked the brother's detailed financial records, precise home-value and equity information, and a clear picture of Petitioner's current post-detention finances.

78. Those gaps could rationally affect the amount of monetary bond. They do not logically answer whether release can be made safe through conditions.

79. The distinction is reinforced by the statute itself. Section 1226(a)(2) authorizes release either on bond of at least $1,500 or on conditional parole. Congress therefore did not design an all-or-nothing system in which the

inability to calculate the ideal dollar amount requires continued incarceration.

80. If the Court believed a high bond was necessary but the record did not permit precise calibration, it could consider a lower bond combined with reporting, GPS supervision, electronic monitoring, geographic restrictions, surrender of travel documents, or other appropriate conditions. If monetary information remained inadequate, conditional parole remained an independent statutory mechanism.

81. Yet the written order provides no individualized explanation for why those measures would fail. It says that the Court "feels" no alternatives or monetary bond are appropriate and later derives from the July 7 arrest encounter the generalized conclusion that Petitioner would not cooperate with "any alternatives to detention." The order does not analyze GPS, scheduled ICE reporting, electronic monitoring, a geographic restriction, or a combined monetary-and-supervisory regime. Meaningful consideration requires more than acknowledging that alternatives exist before rejecting them categorically.

82. The problem is especially stark because detention itself caused some of the financial uncertainty on which the Court relied. The order states that Petitioner earned approximately $57,000 in 2025 but had lost his

employment because he was detained. It therefore allowed the Government's incarceration to make Petitioner's present financial circumstances less certain and then relied upon that resulting uncertainty as part of the explanation for why no monetary release condition could be set. *Hernandez* cannot reasonably be understood to permit that circular result.

### B. The Order Overreads *Matter of A-L-S-* by Converting Speculative Relief Into Independent Affirmative Evidence of Flight

83. The Immigration Judge also relied upon *Matter of A-L-S-*, 29 I. & N. Dec. 794 (BIA 2026), to conclude that Petitioner's prospective relief was "on the more speculative side" because he must first obtain reopening and then prevail on cancellation. The order then stated affirmatively: "This is a flight risk factor." Custody Order at 1. Petitioner does not contend that likelihood of immigration relief is irrelevant. *A-L-S-* and *Matter of R-A-V-P-*, 27 I. & N. Dec. 803 (BIA 2020), expressly permit consideration of whether relief is realistically available because stronger relief prospects may increase an incentive to appear.

84. But *A-L-S-* draws a subtler line than the order reflects. The Board stated that speculative future eligibility based upon conjecture or hypothetical events "does not materially diminish flight risk." 29 I. & N. Dec. at 797. It vacated the custody order there because factual findings concerning potential eligibility were unsupported, and it remanded for reassessment based upon

the totality of the record, including actual applications, family relationships, equities, future attendance, and compliance. The decision therefore permits an IJ to conclude that speculative relief supplies little **mitigating** weight. It does not establish that every additional procedural hurdle itself becomes independent affirmative proof that the detainee is likely to flee.

85. That distinction matters here because Petitioner's Motion to Reopen is not a purely hypothetical application he might someday consider filing. It is an actual pending proceeding rooted in a documented history that already produced a prior Ninth Circuit remand based upon ineffective-assistance concerns. The Court was free to conclude that ultimate 42B relief remained uncertain and therefore afforded limited mitigating weight.

86. The legal concern arises from converting that uncertainty into a separate adverse factor without adequately placing it against the totality of Petitioner's incentives to appear, including the need to participate in the pending Motion to Reopen, the Ninth Circuit Petition for Review, and any future cancellation proceeding.

### C. The Social Security Number Finding Rests Upon an Evidentiary Inference Materially Different From *Matter of Gonzalez Jimenez*

87. The Immigration Judge further relied upon *Matter of Gonzalez Jimenez*, 29 I. & N. Dec. 129 (BIA 2025), in discussing Petitioner's historical tax identifiers. *Gonzalez Jimenez* certainly recognizes that proven use of false or

stolen Social Security numbers and false tax-return information may weigh heavily against discretionary immigration relief. But the evidentiary record in that case was materially different. The BIA relied upon documentary evidence establishing the respondent's use of two false Social Security numbers, including one belonging to a deceased United States citizen, false dependent information on tax filings, contradictory testimony, and specific adverse credibility findings.

88. Judge Flagg had no comparable evidentiary foundation identified in the written order. The order states that two older tax returns used a number ending in 1364, later filings used a number ending in 7154, Petitioner understood the latter to be an ITIN, and he did not know the origin of the former number. The Court then reasoned that multiple ITIN assignments seemed unlikely and therefore the earlier number "appears" to be a false Social Security number. No Social Security Administration record is identified; no evidence establishes to whom the earlier number belonged; no evidence establishes that Petitioner knowingly represented it as a Social Security number; and no separate credibility finding comparable to *Gonzalez Jimenez* is described.

89. The Immigration Judge was permitted under *Guerra* to consider probative evidence and draw reasonable inferences. But the distinction between a

permissible inference and an established fact matters when the inferred misconduct is then counted twice—first as evidence of generalized unwillingness to follow law and again as a predicted reason Petitioner may lose future 42B relief, which in turn is treated as additional flight risk. The cumulative effect magnifies an uncertain factual premise into multiple adverse considerations. Under *Martinez*, whether that reasoning reflects a legally permissible application of the custody standard is reviewable.

### D. Petitioner's Unauthorized Entry and Employment Cannot Substitute for an Individualized Prediction of Future Nonappearance

90. Judge Flagg additionally reasoned that because Petitioner entered without inspection in 1989 and worked without authorization for decades, those facts demonstrate an "inability or unwillingness to follow the laws of the United States" and therefore establish flight risk. Petitioner's immigration violations are unquestionably relevant under *Guerra*, and *A-L-S-* confirms that long periods of unauthorized residence or employment may bear upon whether a person will comply with a future removal order. Petitioner does not ask the Court to erase those considerations.

91. The constitutional problem is the breadth of the inference. Entry without inspection and unauthorized employment characterize a substantial portion of individuals potentially eligible for release under § 1226(a). If those

characteristics themselves establish a generalized unwillingness to comply sufficient to support physical incarceration, Congress's authorization of bond and conditional parole for such individuals becomes significantly diminished.

92. The custody inquiry therefore must remain focused on the particular detainee's likely future conduct rather than treating past immigration status as equivalent to prospective absconding.

93. Here the same record contains unusually strong individualized countervailing evidence: nearly thirty-seven years of residence, an owned home, longstanding employment, three United States citizen children, several citizen grandchildren, no criminal convictions, active legal representation, a pending BIA proceeding, a Ninth Circuit Petition for Review, and a family member willing to assist financially with release. *Guerra* permits one factor to receive more weight than another, but it requires the ultimate decision to remain reasonable.

94. The legal question is whether the order rationally connected Petitioner's historic immigration violations to a conclusion that reasonable present-day conditions cannot assure future compliance.

**E. The July 7 Incident Is Serious Evidence, But It Does Not Establish That Every Alternative to Detention Is Futile**

95. Petitioner does not minimize the July 7 flight incident. It is the strongest evidence supporting the Government's position and appropriately weighs against release. The Immigration Judge reasonably viewed an attempt to run from identified law-enforcement officers as probative of Petitioner's willingness to comply with immigration enforcement. An objective petition should acknowledge that the incident materially distinguishes this case from detainees who peacefully submitted to arrest.

96. The issue is the much broader conclusion drawn from it. The order does not merely say that the incident increases flight risk; it says the incident demonstrates that Petitioner is unlikely to cooperate with any alternatives to detention. Custody Order at 2. That predictive leap is unsupported by any identified history of violating actual alternatives. Running during one arrest does not itself establish experience under—and failure of—GPS monitoring, scheduled reporting, telephonic check-ins, geographic restrictions, monetary bond, or a formal order of supervision.

97. The law does not require release only when the detainee presents no risk whatsoever. If that were the standard, the entire concept of conditions would be unnecessary. Conditions exist because they can mitigate genuine risk. The relevant question is thus whether Petitioner's demonstrated risk is

manageable, not whether his record is spotless. Judge Flagg's inference that one adverse incident proves likely noncompliance with every available alternative comes perilously close to converting a preponderance burden into a requirement that Petitioner eliminate all possible concern.

### F. *Dobrotvorskii* Does Not Convert Missing Sponsor Financial Records Into Proof That the Sponsor Is Unreliable for All Custody Purposes

98. Judge Flagg also cited *Matter of Dobrotvorskii*, 29 I. & N. Dec. 211 (BIA 2025), after concluding that Petitioner's brother was an "unreliable sponsor" because the brother offered to pay bond without producing records establishing financial capacity. *Dobrotvorskii* holds that the existence of a valid, reliable, credible sponsor is relevant to flight risk, and Immigration Judges may consider all probative evidence concerning sponsorship. That principle is unobjectionable.

99. The difficulty is again one of analytical categories. The absence of bank statements or proof of income may make it difficult to determine how much money Petitioner's brother can contribute. It does not necessarily establish that the brother is unreliable in providing housing, transportation, assistance with reporting, emotional support, or ensuring Petitioner's continued connection to the community. Financial capacity and sponsorship reliability overlap, but they are not identical.

100. The order likewise acknowledges that Petitioner independently owns a home. Thus, unlike a case in which an uncertain sponsor leaves the detainee without a known residence or support system, the record before Judge Flagg contained evidence of Petitioner's own fixed property interest and decades-long ties. At minimum, the absence of sponsor liquidity records could justify giving less weight to the brother's promise to finance a particular bond; treating that absence as another affirmative flight-risk factor and then relying upon it to justify incarceration raises a different legal question.

**G. The Cumulative Analysis Effectively Required Petitioner to Eliminate Uncertainty Rather Than Prove Manageable Risk**

101. The errors become most apparent when the order is read as a whole. Petitioner's old immigration violations become generalized proof of unwillingness to follow law. The uncertainty of future relief becomes an affirmative flight-risk factor. An unexplained old tax number becomes apparent Social Security fraud. Lack of sponsor financial documentation becomes sponsor unreliability. One brief effort to evade arrest becomes evidence that every alternative to detention will fail. And insufficient evidence to calculate an exact affordable bond results not in a lower bond, supplemental inquiry, or conditional parole, but in continued incarceration.

102. Even assuming Petitioner properly bore the formal burden of proof, this cumulative methodology effectively required him to eliminate

uncertainty on every axis of the case. That is materially different from proving by a preponderance that he is likely to appear and that reasonable conditions can manage the risk he presents. In *Fletes-Velasquez*, the district court found abuse of discretion where an IJ effectively demanded proof sufficient to conclude that no amount of bail or condition could mitigate risk and then ordered immediate release after the Government had already received a court-ordered hearing. The comparison is persuasive because the problem here is likewise not the existence of one unfavorable fact; it is the standard reflected by the overall reasoning.

103. This is precisely the type of distinction *Martinez* preserves for habeas review. The Court need not decide whether it personally would have regarded the July 7 event as outweighing thirty-seven years of residence. It need only determine whether the IJ's decision applied the legally correct concept of flight risk and whether the articulated reasons reasonably support the categorical conclusion that no bond or alternative can manage that risk.

**PETITIONER'S CONTINUED DETENTION IS NOT REASONABLY RELATED TO A LEGITIMATE REGULATORY PURPOSE WHEN THE IDENTIFIED RISK CAN BE ADDRESSED THROUGH CONDITIONS**

104. Civil immigration detention is regulatory rather than punitive. See *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The Government possesses legitimate and important interests in ensuring attendance at proceedings and

eventual compliance with lawful removal orders. But because physical liberty is fundamental, the means chosen to advance those interests must remain reasonably related to them. Where flight risk can be adequately addressed through less restrictive conditions, continued incarceration ceases to be justified merely because detention is administratively available.

105. Petitioner's circumstances make that relationship especially important. No danger finding exists. No criminal conviction exists. Petitioner's Ninth Circuit proceeding has resulted in a temporary stay of removal, and substantial litigation concerning the underlying removal posture remains pending. The immediate regulatory objective is therefore principally assuring that Petitioner remains available while those proceedings continue. Monetary bond, conditional parole, reporting, electronic supervision, GPS monitoring, and other mechanisms are directly designed to serve that objective without physical confinement.

106. Judge Flagg did not determine that such technologies or supervision programs had previously failed with Petitioner. Nor did he identify evidence that Petitioner had violated a prior bond or formal order of supervision. The continued choice of incarceration therefore depends upon the categorical inference that such conditions will fail based principally upon the July 7 encounter and the other adverse considerations discussed above. Where

those inferences themselves rest upon legally questionable premises, continuing physical detention becomes arbitrary rather than reasonably tailored to the regulatory purpose asserted.

### *MATTER OF W-F-D-* DOES NOT DEFEAT HABEAS JURISDICTION OR PROVIDE A BASIS FOR CONTINUED DETENTION

107. DHS's July 2026 records characterized Petitioner as having a final order of removal, while the August 12 federal habeas judgment required a § 1226(a) bond hearing and the Immigration Court thereafter exercised § 1226(a) custody jurisdiction. On August 25, 2026—after Judge Flagg issued the bond order—the BIA decided *Matter of W-F-D-*, 29 I. & N. Dec. 854 (BIA 2026), holding that Immigration Judges generally lack jurisdiction to re-determine custody once an individual becomes subject to an administratively final removal order.

108. Should Respondents now invoke *W-F-D-* to contend that the August 18 hearing was jurisdictionally unavailable or that § 1231 rather than § 1226 governs Petitioner's present detention, that new contention would not divest this Court of habeas jurisdiction. *W-F-D-* expressly states that a person challenging post-removal-period detention may pursue DHS custody review under 8 C.F.R. § 241.13 or "commence a habeas corpus action in federal district court," quoting *Zadvydas* for the proposition that § 2241 remains

available for statutory and constitutional challenges to post-removal detention. Thus, under either statutory characterization Respondents might advance, the legality of physical detention remains subject to federal habeas review.

109. Petitioner therefore proceeds principally upon the § 1226(a) framework previously ordered by this Court and actually applied by the Immigration Judge, while preserving the alternative contention that if Respondents now claim § 1231 governs, they must establish a lawful basis for custody under that statute and the Constitution. Respondents cannot simultaneously comply with a federal judgment by conducting a § 1226(a) hearing, rely upon the resulting flight-risk decision to continue detention, and thereafter insulate that detention from review by asserting that the administrative tribunal lacked authority to issue the decision in the first place.

**IMMEDIATE RELEASE IS THE APPROPRIATE HABEAS REMEDY**

110. The remedy should account for the history of this case. In the first habeas action, immediate release was requested but the Court selected a narrower response: it gave Respondents seven days to provide an individualized § 1226(a) bond hearing. That remedy was reasonable because the Government had not yet been afforded an individualized opportunity to

demonstrate that Petitioner's detention remained necessary. The August 18 hearing exhausted that remedial opportunity.

111. The posture today is therefore materially different. If the Court concludes that the August 18 determination cannot survive *Martinez* review, another unrestricted remand would not simply provide constitutionally required process for the first time. It would give the Executive a second opportunity, after the first federal habeas victory and first court-ordered hearing, to construct a sustainable justification while Petitioner's liberty continues to be consumed. Habeas relief must eventually terminate unlawful custody rather than create an endless sequence of corrective proceedings.

112. *Fletes-Velasquez* provides the most persuasive analogy. There, an initial § 2241 petition was granted and the Government was ordered either to provide a constitutionally adequate bond hearing or release the petitioner. After the IJ again denied release on flight-risk grounds, the petitioner filed a renewed habeas action without first appealing the second denial to the BIA. The district court excused exhaustion, reviewed the flight-risk determination under *Martinez*, concluded that the Immigration Judge abused his discretion, and specifically considered whether another hearing or release was appropriate. It chose release, holding that where no lawful basis for

continued detention remained, "the appropriate habeas relief is release from custody." It ordered the petitioner released within twenty-four hours.

113. Other courts within the Ninth Circuit have similarly treated federal review as appropriate when a bond hearing furnished pursuant to an earlier habeas order fails the legal standard the federal court required. In *Sanchez Henao v. Hernandez*, the Western District of Washington reviewed a post-order bond denial, rejected renewed exhaustion arguments, and ordered immediate release when the court-ordered process was not constitutionally adequate. The decision expressly recognized that a hearing conducted pursuant to a district court order is reviewable for compliance with the governing legal standard.

114. Immediate release here would not terminate the immigration proceedings, prevent the BIA from adjudicating the Motion to Reopen, invalidate any removal order, or immunize Petitioner from reasonable supervision. Respondents would remain free to require lawful reporting and noncustodial conditions designed to assure appearance. The remedy would simply end physical incarceration where the Government has already received the court-ordered opportunity to establish that such incarceration is necessary and the resulting decision does not lawfully sustain that burden.

115. Immediate release should therefore be the principal remedy. Only if the Court concludes that the defects identified herein can be corrected without perpetuating unconstitutional confinement should another custody proceeding be ordered, and any such alternative proceeding should occur promptly before a different neutral adjudicator and should require a reasoned assessment of the whole record, the proper evidentiary standard, Petitioner's actual ability to pay, and specific alternatives to detention.

## CLAIMS FOR RELIEF

## COUNT ONE

## FIFTH AMENDMENT DUE PROCESS

*(Continued Detention Following A Legally Deficient Court-Ordered Custody Determination*)

116. Petitioner incorporates the preceding allegations. The Fifth Amendment protects Petitioner's fundamental physical liberty from arbitrary civil detention. This Court previously granted habeas and required an individualized § 1226(a) hearing as the remedy for Petitioner's initial confinement without adequate custody review. Although a hearing thereafter occurred, due process is not satisfied by the mere occurrence of a proceeding if the decision continuing incarceration rests upon materially erroneous legal premises or an application of the burden that effectively requires elimination of every uncertainty concerning future compliance.

117. The August 18 order failed to provide a constitutionally adequate individualized justification because it transformed incomplete affordability information into a reason for continued detention, summarily rejected nonmonetary alternatives without explaining why they could not manage the identified risk, converted uncertainty regarding immigration relief into affirmative adverse evidence, relied upon an unverified inference of Social Security misuse, and treated one effort to avoid arrest as proof that all alternatives to detention were likely to fail. Continued physical incarceration under that legally deficient framework violates the Fifth Amendment.

**COUNT TWO**

**ABUSE OF DISCRETION AND LEGAL ERROR UNDER *MARTINEZ v. CLARK***

118. Petitioner incorporates the preceding allegations. Under *Martinez*, application of the governing immigration-detention standard to established facts presents a reviewable mixed question of law and fact. The Court may not reweigh evidence but may determine whether the Immigration Judge applied the correct legal standard. 124 F.4th at 784–85.

119. The August 18 determination constitutes an abuse of discretion because the articulated analysis reflects legal standards materially different from those governing § 1226(a) flight-risk determinations. The decision misuses *Hernandez* by allowing incomplete affordability evidence to support

incarceration, overextends *A-L-S-* by treating speculative relief as independent affirmative flight evidence without the required totality analysis, relies upon a materially undeveloped factual premise when invoking *Gonzalez Jimenez*, conflates missing financial documentation with sponsor unreliability under *Dobrotvorskii*, and infers from one arrest encounter that every alternative to physical detention is inadequate. These are reviewable legal errors rather than disagreements over evidentiary weight.

## COUNT THREE

## CONTINUED DETENTION IS ARBITRARY AND EXCESSIVE IN RELATION TO THE GOVERNMENT'S REGULATORY PURPOSE

120. Petitioner incorporates the preceding allegations. Petitioner's detention is civil, not punitive, and therefore must remain reasonably related to legitimate governmental interests. No adjudicator has found Petitioner dangerous, he has no criminal convictions, he possesses extraordinary residence and family ties, and his ongoing judicial and administrative litigation supplies substantial incentives to remain available to counsel and adjudicative authorities. The Government's only asserted justification is flight risk.

121. To the extent reasonable noncustodial conditions can mitigate that risk, physical incarceration is greater than necessary to accomplish the

Government's regulatory purpose. Section 1226(a) expressly contemplates both monetary and nonmonetary release, and the Government has available supervision mechanisms capable of directly addressing future appearance. Continued incarceration without a reasoned showing that those mechanisms are inadequate violates the fundamental liberty protected by the Fifth Amendment.

## COUNT FOUR

## IMMEDIATE RELEASE IS WARRANTED BECAUSE RESPONDENTS HAVE ALREADY RECEIVED THE COURT-ORDERED OPPORTUNITY TO CURE THE ORIGINAL DETENTION DEFECT

122. Petitioner incorporates the preceding allegations. The first habeas judgment afforded Respondents a meaningful opportunity to cure the original constitutional violation through an individualized custody hearing. Respondents exercised that opportunity on August 18. Where the resulting decision itself cannot withstand federal legal review, § 2241 does not require Petitioner to remain incarcerated while the Government is afforded successive opportunities to justify the same deprivation.

123. Every day spent in unlawful civil detention constitutes an irreversible loss of physical liberty. No BIA decision, remand, or later hearing can restore that time. Consistent with *Fletes-Velasquez*, the traditional function of the Great Writ therefore requires release where the Government has

already received a court-ordered opportunity to justify detention and the resulting record does not provide a lawful basis for continued custody.

PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Court:

A. Assume jurisdiction over this action pursuant to Article I, Section 9, Clause 2 of the United States Constitution and 28 U.S.C. §§ 1331 and 2241;

B. Issue an expedited Order to Show Cause pursuant to 28 U.S.C. § 2243 requiring Respondents promptly to establish the present legal and constitutional basis for Petitioner's continuing physical detention following the August 18, 2026 court-ordered custody redetermination;

C. Take judicial notice of the proceedings, August 12, 2026 Order granting habeas relief, and Judgment entered in *Flores Arroyo v. Mullin*, No. 5:26-cv-04263-KES, insofar as appropriate, and determine that this renewed Petition challenges a new post-judgment custody determination and continuing deprivation of liberty that did not exist when Petitioner's original habeas action was adjudicated;

D. Determine that 8 U.S.C. § 1226(e) does not preclude review of Petitioner's constitutional claims and reviewable questions of law concerning whether the Immigration Judge applied the correct flight-risk standard to the

established facts, consistent with *Martinez v. Clark*, 124 F.4th 775 (9th Cir. 2024);

E. Determine that further administrative exhaustion is not jurisdictionally required and should be excused under *Puga v. Chertoff*, 488 F.3d 812 (9th Cir. 2007), *Laing v. Ashcroft*, 370 F.3d 994 (9th Cir. 2004), and *Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017), because the court-ordered custody hearing has already occurred, the operative record is complete, Petitioner has not deliberately bypassed the administrative process, the claims presented concern legal and constitutional errors suited to federal judicial review, and continued exhaustion cannot provide complete relief from Petitioner's ongoing loss of physical liberty;

F. Determine that the August 18, 2026 custody determination does not provide a legally sufficient basis for Petitioner's continued incarceration insofar as the Immigration Judge applied an impermissibly demanding conception of flight risk, converted uncertainty and incomplete information into affirmative evidence against release, and failed to rationally determine whether reasonable conditions could adequately mitigate the actual risk established by the record;

G. Determine that the Immigration Judge's treatment of Petitioner's financial circumstances and proposed monetary bond was inconsistent with the

principles recognized in *Hernandez v. Sessions*, where the Immigration Judge acknowledged Petitioner's home ownership, prior earnings, and family assistance, yet declined to set any bond in substantial part because the Court believed it possessed insufficient information to determine precisely what amount Petitioner could afford;

H. Determine that uncertainty concerning the precise amount of an affordable monetary bond did not establish that continued physical incarceration was necessary, particularly where 8 U.S.C. § 1226(a)(2) expressly authorizes both monetary bond and conditional parole and where reporting requirements, electronic monitoring, GPS supervision, geographic restrictions, and other noncustodial conditions remained available;

I. Determine that the August 18, 2026 decision did not meaningfully establish why those alternatives, individually or in combination, would be inadequate to reasonably assure Petitioner's future appearance;

J. Determine that the Immigration Judge materially misapplied or overextended *Matter of A-L-S-*, 29 I. & N. Dec. 794 (BIA 2026), to the extent the order converted the uncertain ultimate success of Petitioner's pending immigration relief into an independent affirmative "flight risk factor," rather than determining the appropriate mitigating weight of that relief within the totality of the record;

K. Determine that continued detention may not rest upon materially speculative factual premises, including the inference that an unidentified number appearing on decades-old tax records constituted knowing use of a false Social Security number, absent an adequate evidentiary foundation supporting that conclusion;

L. Determine that Petitioner's July 7, 2026 attempt to evade apprehension, although legitimately relevant to flight risk, does not by itself establish that Petitioner would fail to comply with every available release condition, particularly in the absence of evidence that Petitioner previously violated bond, electronic monitoring, reporting obligations, an order of supervision, or other formal noncustodial conditions;

M. Determine that the August 18, 2026 custody determination failed to adequately account for the totality of Petitioner's individualized circumstances, including his approximately thirty-seven years of residence in the United States, fixed Southern California residence and home ownership, longstanding employment, three United States citizen children, United States citizen grandchildren, complete absence of criminal convictions, lack of any finding of dangerousness, active legal representation, and substantial pending judicial and administrative proceedings providing powerful incentives for future appearance;

N. Issue a Writ of Habeas Corpus declaring that Petitioner's continuing physical detention pursuant to the legally deficient August 18, 2026 custody determination violates the Fifth Amendment and federal law;

O. Order Respondents to immediately release RAMON FLORES ARROYO from immigration custody, and in no event later than twenty-four hours after entry of the Court's Order, subject only to such reasonable and constitutionally permissible noncustodial conditions as are necessary to assure his future appearance;

P. Determine that immediate release, rather than another unrestricted remand, is the appropriate habeas remedy because Respondents have already received the opportunity afforded by this Court's August 12, 2026 habeas judgment to establish a constitutionally sufficient individualized justification for continuing Petitioner's detention;

Q. Enjoin Respondents from re-arresting or re-detaining Petitioner upon the same existing factual record absent materially changed circumstances establishing a new and lawful basis for detention and compliance with any process required by the Constitution and applicable federal law;

R. Permit Respondents, following Petitioner's release, to impose reasonable noncustodial reporting, supervision, monitoring, or other conditions lawfully

tailored to assuring Petitioner's appearance during the pendency of his immigration proceedings;

S. Alternatively, and only if this Court declines to order immediate release, require Respondents within a short and definite period to provide Petitioner a new constitutionally adequate custody determination before a neutral adjudicator, preferably one other than the Immigration Judge whose August 18, 2026 determination is challenged herein, at which the governing flight-risk standard is correctly applied to the complete individualized record;

T. Require, at any such alternative custody proceeding, meaningful consideration of Petitioner's actual ability to pay, the statutory availability of conditional parole, and each reasonable alternative to physical detention, and require the adjudicator to articulate individualized findings explaining why any rejected condition or combination of conditions would be inadequate to mitigate the flight risk actually established by the evidence;

U. Require, at any such alternative proceeding, that the applicable evidentiary standard not be transformed into a requirement that Petitioner eliminate every conceivable possibility of nonappearance or prove with certainty that no flight risk exists;

V. Determine that Petitioner's pending administrative and judicial challenges to his removal proceedings, including any presently effective stay of

removal, do not divest this Court of jurisdiction over the analytically distinct question whether Respondents may continue physically incarcerating him;

W. Prohibit Respondents from transferring Petitioner outside the territorial jurisdiction of the Central District of California while this renewed Petition remains pending without reasonable advance notice to Petitioner, undersigned counsel, and this Court;

X. Retain jurisdiction over this action for the limited purpose of ensuring Respondents' prompt compliance with any writ, release order, or other remedial directive entered by this Court;

Y. Award such costs and attorneys' fees as may subsequently be established under applicable law, including through a timely post-judgment application under the Equal Access to Justice Act, 28 U.S.C. § 2412, if appropriate; and

Z. Grant such additional declaratory, injunctive, equitable, and habeas relief as this Court determines necessary and proper to terminate any unlawful restraint upon Petitioner's liberty.

Dated this 31st day of August, 2026.

______________________________
Carlos Barrios

**VERIFICATION BY PETITIONER PURSUANT TO 28 U.S.C. § 2242**

I, Carlos Barrios, am submitting this verification on behalf of RAMON FLORES ARROYO, who is currently detained by the U.S. Department of Homeland Security at the ADELANTO DETENTION FACILITY in Adelanto, California. Petitioner is being held under conditions that severely restrict or prevent meaningful communication with the outside world.

As a result, he is unable to review or sign this petition personally or to prepare and file it on his own behalf.

I have communicated with Petitioner to the extent possible and have obtained the factual information contained in this Petition from my direct knowledge, records, and reliable sources. I hereby verify that, to the best of my knowledge and belief, the factual statements contained in the attached Petition for Writ of Habeas Corpus are true and correct, and that I could testify to those facts if called upon to do so.

8/31/2026

Carlos Barrios